**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

Nos. 96-30968 & 96-30999

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LESTER J. MILLET, JR.

Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Louisiana

September 15, 1997

Before DUHÉ and BARKSDALE, Circuit Judges, and COBB,[1] District Judge.

HOWELL COBB, District Judge:

A jury in the federal district court for the Eastern District of Louisiana convicted the defendant for violations of 18 U.S.C. §§ 2, 1951, 1952, and 1956, resulting from the misuse of his official position as Parish President of the St. John the Baptist Parish, Louisiana. Millet challenges his convictions on a variety of theories. Finding no merit in any of these theories, we affirm.

**I.**

**BACKGROUND**

---

[1] District Judge of the Eastern District of Texas, sitting by designation.

Between January, 1988 and October, 1992, Defendant-Appellant Lester Millet, the duly elected President of St. John the Baptist Parish, Louisiana, extracted, under color of official right, a portion of the commission earned by Durel Matherne from the sale of the Whitney Plantation (Whitney) to the Formosa Chemical Corporation (Formosa). Formosa, a Taiwanese Corporation, acquired the Whitney Plantation for the purpose of building a rayon pulp industrial facility in St. John the Baptist Parish, Louisiana.

In 1988, Formosa, in search of a location for a new rayon pulp facility, narrowed its choices to Texas and Louisiana. Formosa considered Louisiana to have advantages over Texas because two suitable sites for the proposed facility were identified and readily available, and Louisiana had superior access to both raw materials and deep-water shipping lanes on the Mississippi River. The two Louisiana sites were both located on the west bank of the Mississippi River in St. John the Baptist Parish. The first site (Willowbend) was owned by the Shell Oil Corporation. It appeared to be the most suitable of the two because it was already zoned for heavy industry, an environmental impact statement (EIS)[2] was nearly complete, and the river abutting the property's batture was deep enough for ocean going vessels. The second site (Whitney), owned by the Barnes family, was large enough for the facility but it was zoned for agriculture, no EIS was underway, and the river abutting the property was not deep enough to support ocean going vessels.

In late 1988, after Formosa rejected the Willowbend site as too expensive, Millet engaged his friend Durel Matherne, a licenced real estate broker who was not actively engaged in a commercial real estate business, in a scheme in which Millet would arrange for Matherne to become the exclusive broker for the sale of the Whitney. In exchange for Millet's influence as President of St. John the Baptist Parish to secure his contract to

---

[2] At the time, the United States Environmental Protection Agency (EPA) required an EIS before constructing a new chemical manufacturing facility in this area.

broker the property, Matherne was expected to share with Millet the sizeable ($479,000) commission he earned from the sale of the Whitney.

Millet, identifying himself as a high ranking public official, then met with Walter Barnes and informed him that the Whitney Plantation could be sold to Formosa for the rayon pulp facility and insisted that Matherne be the broker for the sale. Barnes agreed to the arrangement. Millet then promised Formosa that if it purchased the Whitney Plantation for the rayon facility, he would use his authority to push through the needed rezoning and would ensure Formosa obtained the necessary deep water access for the facility. Millet planned to do this by "convincing", through threats of expropriation if necessary, owners of property adjacent to the Whitney (Wallace tracts) to convey their property to Formosa. He also promised Formosa to assist in obtaining the necessary EPA permits.

In May, 1989, Formosa and the Barnes family signed a contract for the sale of the Whitney. Formosa's purchase was conditioned on being able to obtain the Wallace tracts and necessary rezoning.

Apparently aware of the Whitney's shortcomings and the conditional nature of the contract, Shell contacted Virginia Simons, the development manager for the Port of South Louisiana, to reconvene negotiations between Shell and Formosa for the sale of the Willowbend site. Simons arranged a meeting in which she, a Shell representative, and Millet discussed Shell's interest. In that meeting, Millet verbally abused both of them for "messing with his deal". Shortly afterwards, Millet tried to use his official position as Parish President to have Simons fired and later arranged to withhold $1,000,000 in funds from the port. In April, 1990, the sale of the Whitney to Formosa was completed and Millet immediately demanded a $200,000 share of the $479,000 commission from Matherne. To effect this transfer, Millet bought an undeveloped piece of real estate (Highway 51 Property) for $200,000 and, against the advice of Matherne's attorney and

**3**

within two weeks conveyed **one-half** of it to Matherne for $200,000.

In September, 1990, Matherne submitted a proposal for a contract to provide wood chips to the proposed Formosa facility. On learning of Matherne's proposal, Millet made it clear to Matherne that, even though he (Millet) had no capital to invest in the wood chip venture, he would participate with Matherne on a 50-50 basis. Millet intended to contribute by using his official position to secure the lucrative contract for himself and Matherne. Millet further made it clear that if he was not allowed to participate, he would use his position to spoil the deal for Matherne.

In January, 1991, Millet, Alden Andre,[3] and Lionel Bailey[4] traveled from Baton Rouge to Dallas to meet with the EPA concerning permits for the proposed rayon plant. Upon returning from Dallas, Millet offered to give Bailey a convenience store which would be located near the rayon facility in exchange for Bailey's assistance in securing the wood chip contract. Bailey reported this offer to Andre shortly after it was made.

Just prior to the Dallas trip, The New Orleans Times Picayune reported the Highway 51 land transaction in an investigative article. This disclosure embarrassed Formosa officials in the United States and Taiwan. In October, 1992, Formosa abandoned its plans to construct the rayon pulp facility in part because of mounting public opposition and in part because of the activities of Lester Millet.

Pursuant to a three count indictment, Millet was charged with: Count 1, violating 18 U.S.C. §§2, 1951, (Hobbs Act); Count 2, violating 18 U.S.C. §§2, 1956 (Money Laundering); and Count 3, violating 18 U.S.C. §1952 (Travel Act). In accord with the provisions of 18 U.S.C. §982, the government also sought a forfeiture of the $200,000 Millet received from Matherne. The jury convicted Millet of all three counts. He was subsequently sentenced to fifty-seven (57) months imprisonment, fined $200,000, and

---

[3] Formosa's vice president.

[4] Formosa's environmental manager.

**4**

ordered to forfeit $200,000.

On timely appeal, Millet raises nine issues in urging this Court to reverse his convictions.[5] Even though Millet's enumerates nine issues, in essence he challenges his Hobbs Act conviction on grounds of constructive amendment and insufficiency of the evidence;[6] his money laundering conviction on grounds that the Hobbs Act conviction is invalid;[7] and his Travel Act conviction on grounds that the Hobbs Act conviction cannot be the "unlawful activity", the indictment was insufficient and the court improperly charged the jury[8].

## II.
## THE HOBBS ACT

---

[5]  On appeal Millet raises the following issues:

1) Over objection, the trial court charged, and the government argued at trial that the jury could convict on Count 1, a violation of 18 U.S.C. §1951 ("Hobbs Act") on evidence of the effects on interstate commerce other than relates to the specified victim;
2) The jury was allowed to convict on a theory of extortion of victims other than the charges in the indictment;
3) The only act by Millet related to the charged extortion was a telephone call to a private individual over whom the official had no power and upon whom he exercised no official power before Millet's first contact with the alleged victim;
4) The only thing received by Millet from the alleged victim was the purchase price of property on a "value for value" basis to which Millet was entitled;
5) The proof at trial does not show a promise from Millet to perform an official act in exchange for a benefit from the alleged victim. The official act occurred before Millet had contact with the victim;
6) Count 2 of the indictment which charges a violation of 18 U.S.C. §1956 ("Money Laundering") states as its predicate offense the Hobbs Act violation and since the Hobbs Act conviction cannot stand, the money laundering conviction cannot stand;
7) A scheme to "personally benefit" from the Formosa plant is not unlawful under the Hobbs Act;
8) Count 3 which charges a violation of 18 U.S.C. § 1952 ("Travel Act") cannot be sustained because it is predicated on an "official act" Hobbs Act violation which is deficient in its proof of "effect on interstate activity";
9) The adoption of the Hobbs Act charge as the unlawful activity for the Travel Act charge is prejudicial error because the Hobbs Act crime terminated before the necessary travel for the Travel Act.

[6]  Issues 1, 2 ,3, 4 and 5 relate to Millet's conviction under the Hobbs Act.

[7]  Issue 6 relates to Millet's conviction on money laundering.

[8]  Issues 7, 8, and 9 relate to Millet's conviction under Travel Act.

The Hobbs Act penalizes: (1) "[w]hoever in any way or degree obstructs, delays, or affects commerce or any article in commerce, (2) by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do any thing in violation of this section[.]" 18 U.S.C. § 1951(a) (West 1997). Millet argues that his conviction under the Hobbs Act must be reversed because the district court constructively amended the indictment and the evidence presented at trial was insufficient to convict.

(a)     Constructive Amendment

A constructive amendment to the indictment occurs when the jury is permitted to convict the defendant on a factual basis that effectively modifies an essential element of the offense charged in the indictment. United States v. Young, 730 F.2d 221, 223 (5th Cir. 1984); United States v. Holley, 23 F.3d 902, 912 (5th Cir. 1994) (citations omitted). However, all factual variations do not rise to the level of a constructive amendment. This Court must distinguish between a constructive amendment to the indictment and mere variations between the indictment and proof.

An indictment can be constructively amended either by evidence offered at trial or by jury instruction. Stirone v. United States, 361 U.S. 212 (1960). The constructive amendment can be either explicit or implicit. United States v. Duocet, 944 F.2d 169, 172 (5th Cir. 1993). Millet argues both apply here. He contends his indictment was constructively amended when the district court permitted the government to offer proof concerning the direct effect his act had on Formosa's interstate commerce activities, and when the district court included a theory within the Hobbs Act jury charge which allowed the jury to find a Hobbs Act violation if it found that Millet's actions directly and adversely affected Formosa.

In the absence of a timely objection at trial, this court subjects a post-conviction

**6**

claim of constructive amendment to plain error analysis. United States v. Olano, 507 U.S. 725, 731-34 (1993); United States v. Reyes, 102 F.3d 1361, 1364 (5th Cir. 1996). Mere factual variations between the indictment and proof at trial are examined under the harmless error doctrine. Young, 730 F.2d at 223. At trial, Millet failed to object to the evidence concerning the effect his acts had on Formosa's commerce activities and, although he raised a general objection to the Hobbs Act jury charge, it was insufficient to preserve a constructive amendment error. Accordingly, we first look to see if there was a constructive amendment to the indictment and if there was, we analyze for plain error.

For this Court to find a constructive amendment to the indictment, we review the record to determine if evidence offered at trial or the district court's jury charge permitted the jury to convict Millet on a factual basis which effectively modified one of the two essential elements charged of the Hobbs Act indictment. Id. As it applies to this case, the two essential elements of the Hobbs Act are extortion and commerce. Commerce means, "[A]ll commerce between any point in a state ... and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3) (West 1997). The term extortion means, "the obtaining of property from another with his consent ... under the color of official right". 18 U.S.C. § 1951(b)(2) (West 1997).

Millet bases his constructive amendment argument on Paragraph 18 of Count 1 which states:

> From on or about January 11, 1988, and continuing until or about January 13, 1992 in the Eastern District of Louisiana and elsewhere, LESTER J. MILLET, JR., while serving as Parish President for St. John the Baptist Parish, Louisiana did knowingly, willfully and unlawfully, affect and attempt to affect interstate commerce by means of extortion, in that the defendant did unlawfully obtain approximately $200,000 not due him or his office from Durel Matherne, with Durel Matherne's consent, under color of official right, that is, for or because of official act by LESTER J. MILLET, JR., related to the sale of the Whitney Plantation.

**7**

In urging this court find a constructive amendment, Millet argues the district court was bound to narrowly construe this charging paragraph as a "specific act against an individual" and as such, the government was limited to proving the extortion element, and proving the effect on interstate commerce by only offering evidence that: 1) his act depleted the assets of Matherne, an individual customarily engaged in interstate commerce; 2) his act caused the completion of, or created the likelihood that the assets of an entity engaged in interstate or foreign commerce would be depleted; or 3) the number of individuals affected was so great or the sum extorted was so large that there was some cumulative effect on interstate commerce. United States v. Collins, 40 F.3d 95, 100 (5th Cir. 1994). In short, Millet insists that, as in Collins and Stirone his indictment was constructively amended when the district court accepted evidence that his actions directly affected Formosa's interstate activities, this evidence impermissibly modified the essential commerce element, and that the jury was allowed to convict on that basis. Id. We disagree.

We distinguish Stirone and Collins on the facts. In Stirone, the defendant's Hobbs Act conviction was reversed when the Court found his indictment was constructively amended by the district court's admission of evidence and its jury charge that permitted the jury to convict Stirone upon a showing that his acts affected the movement of steel in interstate commerce. Stirone, 361 U.S. at 214. The Court reasoned that because Stirone's indictment charged only that the defendant's extortionate act affected the movement of sand (an important building material) in interstate commerce, it was uncertain whether Stirone was convicted of impeding commerce in sand, as charged or steel which was uncharged. Id. at 219. Unlike the Stirone indictment, we read Paragraph 18 of Count 1 of the indictment as drawn in general terms that tracks the statutory language of 18 U.S.C. §1951(a). There is no limitation imposed on proving the effect on interstate commerce.

**8**

Likewise, <u>Collins</u> is distinguished in that the Hobbs Act charge stemmed from the defendant's robbery of the personal property of a salesman. <u>Collins</u>, 40 F.3d at 99-100. No extortion was involved. Furthermore this Court found that the nexus between the robbery victim and interstate commerce was at best indirect and extremely attenuated and more than likely, there was none. <u>Id</u>. Here, Millet's extortionate act was integral to a land transaction of a multi-national corporation and was a cause of Formosa's abandonment of its plans. <u>Collins</u> simply does not control this case.

Millet's argument that Paragraph 18 of Count 1 is a specific charge against an individual has merit only if the last clause were taken entirely out of context or if it stood alone as Count 1. We decline to read the last clause out of context and we also decline to ignore the preceding seventeen (17) paragraphs in Count 1 of Millet's indictment.

When an indictment under the Hobbs Act is drawn in general terms, a conviction may rest on a showing that commerce of one kind or another has been burdened. <u>Stirone</u>, 361 U.S. at 218. It follows that when the indictment is drawn generally, the government may offer proof that the act either directly or indirectly affected interstate commerce. <u>Id</u>. We see the only limitation imposed by Count 1 of the indictment was that the government was limited to proving extortion under color of official right as opposed to robbery, threats, or the use of physical violence. Our examination of the record indicates no such proof of the latter three was offered.

We find the district court did not err in admitting proof that Millet's extortionate act directly affected the interstate activities of Formosa. Count 1, including Paragraph 18, when read in its entirety indicates a general indictment under the Hobbs Act and as such, the district court's admission of proof that Millet's act directly affected Formosa did not modify the essential element of interstate commerce as defined by 18 U.S.C. §1951(b)(2) (West 1997).

Millet also urges a constructive amendment of his indictment because the court

**9**

supplemented the <u>Collins</u> factors <u>supra</u> in its jury charge with, "Under this theory the defendant may have interfered with or affected interstate commerce in one or all of the following ways: ... 4) adversely affecting the interstate and international commerce activities of Formosa Plastics Corporation ... . ".[9] However, the <u>Collins</u> factors apply only if a criminal act was directed to an individual and therefore, the district court was warranted in supplementing the <u>Collins</u> factors. <u>Collins</u>, 40 F.3d at 100. Accordingly, this Court looks to whether the district court's jury charge **as a whole** is a correct statement of the law. <u>United States v. Stacey</u>, 896 F.2d 75, 77 (5th Cir. 1990). We find that the district court's Hobbs Act jury charge in which it gave the <u>Collins</u> factors along with its supplemental factor was a correct statement of law and did not constructively amend the indictment. Moreover, we think the charge was helpful to the jury in that it illustrated the possible ways that Millet's extortionate act may have affected interstate commerce.

In summary, we find there was no constructive amendment to Count 1 of the indictment and therefore, we need not undertake plain error analysis.

(b)    <u>Sufficiency of the Evidence</u>

In determining whether there was sufficient evidence to support a conviction, this Court must determine, in a light most favorable to the verdict whether a rational trier of the facts could have found that the evidence established guilt beyond a reasonable doubt.

---

4  The Court's charge to the jury on Count 1 included the following:

> Under this theory the defendant may have interfered with or affected commerce in any one or all of the following ways: 1) depleting the assets of an individual customarily and directly engaged in interstate commerce; 2) causing or creating the likelihood that Durel Matherne would deplete the assets of a business or businesses engaged in interstate commerce; 3) extorting such a large amount that it had a cumulative effect on interstate commerce; or 4) adversely affecting the interstate and international commerce activities of the Formosa Plastics Corporation, a company headquartered in Taipai, Taiwan, Republic of China.

Jackson v. Virginia, 443 U.S. 307 (1979); United States v. Carrasco, 830 F.2d 41, 43-44 (5th Cir. 1987). Millet advances three separate theories as to why there was insufficient evidence to support his conviction. We disagree with all of them.

Millet first contends there could have been no extortion because his only act related to the charged extortion was to place a telephone call to a private individual over whom the official had no power and upon whom he exercised no official power before Millet's first contact with the alleged victim. This is nonsense.

To prove extortion the government must show that Millet took money or something of value not due him or his office for the performance or non-performance of an official function. See McCormick v. United States, 500 U.S. 257 (1991). The official need not control the function in question if the extorted party reasonably believes in the official's powers. United States v. Rabbitt, 583 F.2d 1014 (8th Cir. 1978). Millet claims that because this was a private deal between private parties, there can be no "color of official right". The record is replete with evidence that Durel Matherne, who was not a practicing real estate agent, could not have become the exclusive broker for the sale of the Whitney Plantation without the approval of Millet who was acting in his capacity as the St. John the Baptist Parish President. The record also contains substantial evidence that in exchange for arranging Matherne's employment as the exclusive broker for the Whitney's sale, Millet demanded and received a portion of the Whitney sales commission. Specifically, Walter Barnes, one of the Whitney's owners, testified he had not heard of Matherne before Millet introduced them, and the only reason Millet was able to secure Matherne 's employment as broker for the Whitney was because of his official position as St. John the Baptist Parish President. We find there was sufficient evidence for a rational jury to conclude that all parties involved believed they must accede to Millet's demands to accomplish the sale of the Whitney to Formosa.

Millet next argues he did not explicitly promise to perform an official act in exchange

for a benefit from the alleged victim. He further asserts that he committed no official act and therefore, cannot be convicted under the Hobbs Act. As authority, Millet cites Evans v. United States, 504 U.S. 255 (1992). Millet misreads Evans. Evans stands for the proposition that an explicit demand for payment for the official act is not required to convict under the Hobbs Act and further, that an affirmative step is not an element under the statute. Id. at 268. Millet used the apparent authority of his official position to secure the real estate listing for Matherne. Furthermore, the government proved at trial that Millet used his official capacity to satisfy the conditions imposed by the contract for the sale of the Whitney to ensure the sale was ultimately consummated. We find the government's theory that the payment Millet extracted from Matherne was in exchange for not just the listing but, for all of his official acts is credible, and that it satisfies the *quid pro quo* requirement of the Hobbs Act.

Finally, Millet argues the only thing he received from the alleged victim was the purchase price of the Highway 51 property on a "value for value" basis to which he was entitled. Millet's argument refers to his conveyance of half of the Highway 51 property to Matherne's wife in exchange for approximately one-half of Matherne's commission from the sale of the Whitney. He contends that if the Highway 51 property were developed, subdivided and later sold as individual lots, Matherne would more than recover the $200,000 he transferred to Millet for the property. The implication is that this transaction was an arms-length contract for the sale of real estate. We find this argument entirely without merit.

In Louisiana, it is well settled that the value of an immovable property be evaluated according to the state in which it was **at the time of the sale**. See LA. CIV. CODE. ANN. art. 2590 (West 1997) (emphasis added). The "market value" of a property means "the fair value of the property between one who wants to buy and one who wants to sell under the usual circumstances." Henderson v. Dyer, 68 So.2d 623, 625 (La. Ct. App. 1st Cir. 1953)

**12**

(citations omitted). At trial, the jury was presented with substantial evidence: that the portion of the Highway 51 property did not have a fair market value of $200,000 at the time it was conveyed to Matherne; that the property was not sold under the usual circumstances; and that Matherne did not want to buy the property.

The government presented credible evidence that Millet and Matherne sought a means of conveying to Millet the $200,000 which represented Millet's share of the Whitney commission. Among the schemes considered were: a direct payment from Matherne to Millet; an office lease under which Matherne would pay a grossly inflated rental; and paying Millet's son a grossly inflated draw as a new "partner" in Matherne's insurance business. Matherne's attorney advised that all these sham transactions were thinly disguised kickbacks which would constitute an illegal payment to a public official. Despite that warning, to effect the $200,000 kickback Millet bought the Highway 51 property for $200,000 and almost immediately demanded Matherne accept one-half of that property in exchange for $200,000.

At trial, the government presented substantial evidence that, at the time Millet conveyed half of the Highway 51 property to Matherne, the **entire** undeveloped Highway 51 property was worth at most, $200,000. The government also offered credible evidence that when Millet divided the property into halves and conveyed one-half to Matherne, the half he conveyed to Matherne had a value of less than one-half of the original $200,000 purchase price. Yet, Matherne paid $200,000 for his parcel. All of this occurred less than two weeks from the time Millet originally bought the property. Given the evidence, the timing and the fact that Millet presented no credible evidence to support his position that the value of the parcel conveyed to Matherne was worth anywhere near $200,000, we find that a rational jury could find beyond a reasonable doubt this transaction was a sham designed to kick-back part of Matherne's Whitney commission to Millet.

Matherne did not want to purchase the undeveloped Highway 51 property from

**13**

Millet but did so only because of pressure applied by Millet for a share of the Whitney commission. Matherne was not in the business of real estate speculation or real estate development and would ordinarily have no interest in an undeveloped parcel of property; particularly one for which he would have to pay at least twice the market value. Evidence in the record also indicates that at the time of the Highway 51 transaction, Matherne had financial and (income) tax difficulties to which he would likely have applied the $200,000 Millet demanded for the property. Matherne's testified that at best, he expected to break even if he could develop and sell the property. All this is evidence that given a free choice, Matherne had no desire to purchase the Highway 51 property.

Though Matherne was not a practicing real estate agent, he held a valid real estate licence and was hardly a novice when it came to valuing the undeveloped Highway 51 property. Matherne testified that he knew the value of the Highway 51 property was less than one-half of what he was paying. Given disparities in value, the parties' knowledge thereof, their relative positions, and the fact that there was no evidence presented that Millet and Matherne conducted any sort of price negotiation (a strong indicator of an arms-length transaction) a rational jury would conclude these were not the usual circumstances under which a real estate transaction occurs.

We find sufficient evidence was presented at trial that a reasonable jury would characterize the Highway 51 land transaction as a sham or kickback scheme designed to convey a $200,000 share of the Whitney Plantation commission from Durel Matherne to Lester Millet. We further find that all elements of 18 U.S.C. §1951 were proven beyond a reasonable doubt and accordingly we AFFIRM Lester Millet's Hobbs Act conviction.

### III.
### MONEY LAUNDERING

Millet's sole basis for urging this Court to reverse his conviction under 18 U.S.C. §1956 (money laundering) is that his conviction under the Hobbs Act must be reversed and therefore, there was no unlawful activity to support the money laundering conviction. The pertinent section of the money laundering statute, states:

> (a)(1) Whoever knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
> (B) knowing that the transaction is designed in whole or in part -- (I) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of a specified unlawful activity;[.]

18 U.S.C. §1956(a)(1)(B)(I) (West 1997).

Because we affirm Millet's conviction under the Hobbs Act, the Hobbs Act serves as the unlawful activity, and we find that the Highway 51 real estate conveyance fits the definition of a financial transaction designed to conceal the source of the proceeds, we AFFIRM Millet's conviction under 18 U.S.C. §1956.

## IV.

## THE TRAVEL ACT

To obtain a conviction under 18 U.S.C. § 1952 (Travel Act), as it applies to the instant case, the government had to prove the following elements beyond a reasonable doubt: 1) travel in interstate or foreign commerce; 2) with the intent to; 3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity; and 4) thereafter performs or attempts to perform [an act described in element 3]. 18 U.S.C. § 1952(a)(3)(A) (West 1997). "Unlawful activity" means, extortion, bribery, or arson in violation of the laws of the state in which committed or of the United States. 18 U.S.C. § 1952(b)(i)(2) (West 1997).

Millet attacks his conviction under the Travel Act on three theories: 1) a scheme to "personally benefit" from the Formosa plant is not unlawful under the Hobbs Act and consequentially is not unlawful under the Travel Act; 2) because his Hobbs Act, which serves as the "unlawful activity" must be reversed on insufficient proof of an "effect on interstate activity", his Travel Act conviction too must be reversed; and 3) the adoption of the Hobbs Act charge as the unlawful activity for the Travel Act charge is prejudicial error because the Hobbs Act crime terminated before the necessary travel for the Travel Act. We find no merit in any of these theories.

Millet first complains that the use of the phrase, "scheme to personally benefit" in Count 3, Paragraph 1 does not state a crime under the Hobbs Act and therefore cannot be the requisite unlawful activity as defined by the Travel Act. This complaint suffers from the same flaw as his Hobbs Act constructive amendment argument; that being Millet extracts a single phrase from context and argues that the phrase standing alone, somehow invalidates the entire count. Even if we find that the phrase he complains of was inartfully drawn, we decline to read it totally out of context. When Paragraph 1 of Count 3 is read in its entirety, it is clear that it refers to a Hobbs Act violation. We also note that Millet's argument here is particularly specious because the record indicates he motioned the district court for an **eleven part** bill of particulars directed solely to Count 3 of the indictment. Nowhere in that motion did Millet raise this somewhat trivial complaint and though his motion was denied, he received a full hearing at which he conceded the government adequately responded in writing to his query concerning the nature of unlawful activities that formed the basis for the Travel Act indictment. We therefore dismiss this complaint as groundless.

Millet next complains that his Travel Act conviction cannot be sustained because it was predicated on a Hobbs Act "official act" conviction which was deficient in its proof on the effect on interstate commerce. Because, for reasons stated above, we find the

**16**

jury properly convicted Millet of the charged Hobbs Act violation, we find this argument without merit.

Finally, Millet argues that the adoption of the Hobbs Act charge as the unlawful activity for the Travel Act charge is prejudicial error because the Hobbs Act crime terminated before the necessary travel for the Travel Act occurred. This argument appears to be premised on his notion that for there to be a conviction under the Travel Act, there necessarily must be a conviction of the underlying predicate unlawful activity. This is not the law.

The Travel Act was one of several bills enacted by Congress to aid the states in the battle against organized crime. Perrin v. United States, 444 U.S. 37, 41-42 (1979)(citations omitted). Because the definition of the unlawful activity refers to both state as well as federal offenses, it is clear Congress intended for the Travel Act to supplement state authority in battling organized crime problems. Id. at 42. It is also well settled that under the principles of federalism, the federal courts may not assume jurisdiction over state offenses. Therefore, it clearly follows that if a state law offense were to serve as the underlying "unlawful activity" for the Travel Act and the law is to supplement state law rather than burden it, there can be no requirement for a conviction of the underlying unlawful activity.[10] See United States v. Nardello, 393 U.S. 286, 290-95 (1969)(*discussing* the use of a state law as the underlying unlawful activity); United States v. Jones, 642 F.2d 909, 913 (5th Cir. 1981) (defendant convicted of Travel Act violation without underlying conviction of illegal organized gambling). Lastly, a violation of the Travel Act does not require that a facilitation act in the destination state be an unlawful activity. Perrin, 444

---

[10] It further follows that if the Travel Act requires no conviction of an underlying state offense, it also follows that there need be no conviction of an underlying federal offense.

U.S. at 49-50.[11]

Accordingly, we find that Count 3 of the indictment properly charges a violation of the Travel Act. It properly identifies the unlawful activities, it identifies the interstate travel and it identifies the act Millet thereafter attempted to perform (promotion).[12]

We do not agree that Millet's Travel Act conviction is necessarily predicated on his Hobbs Act conviction. The record supports and the government proved at trial that Millet engaged in a multi-faceted scheme to extract illegal personal profits wherever practicable, "under color of official right" from the siting of Formosa's rayon pulp plant. While the scheme itself is not the underlying unlawful activity, any one of its individual components may serve as the unlawful activity if it meets the statutory definition and the government meets its burden of proving beyond a reasonable doubt that the defendant committed the unlawful activity.

Finally, we look at the court's jury instructions to ensure that the jury was properly charged. In reviewing the propriety of a jury instruction, this court looks at whether the charge **as a whole** is a correct statement of the law. Stacey, 896 F.2d at 77. We find that the district court corrctly stated the law in its jury charge on the Travel Act.

Because Count 3 of the indictment properly charged a violation of the Travel Act, sufficient evidence was presented at trial for a rational jury to convict Millet of the charge, and the district court properly instructed the jury, Millet has no substantive complaint. His

---

[11] This is not to say that there is no limitation on the reach of Travel Act. The Court in Rewis v. United States, limited the reach of the Travel Act by requiring a tangible nexus to interstate commerce and by warning
that the act could not be used to turn a relatively minor state offense into a federal felony. Rewis v. United States, 401 U.S. 808, 811-12 (1971). We note that when the underlying unlawful activity is an uncharged federal or a state law offense, there are three essential elements which must be proved beyond a reasonable doubt: 1) the defendant traveled in interstate commerce on or about the time and between the places charged in the indictment; 2) the defendant engaged in such travel with the specific intent to promote, manage, establish or carry on an unlawful activity; and 3) the defendant thereafter knowingly and willfully committed an act to promote, manage, establish or carry on such unlawful activity. United States v. Green, 882 F.2d 999, 1006 (5th Cir. 1989).

[12] The "promotion" corresponds to the fourth element of the Travel Act. In this case it refers to Millet's attempt to bribe Lionel Bailey in violation of Louisiana's Commercial Bribery Statute. La. Rev. Stat. Ann. §14.73 (West 1997).

conviction under 18 U.S.C. §1952 is hereby AFFIRMED.

## V.

## CONCLUSION

For reasons stated above, we find no reason to disturb the jury's decision to convict Millet for violations of 18 U.S.C. §§ 2, 1951, 1952 and 1956. We also find no reason to disturb the forfeiture resulting from Millet's unlawful activities. Accordingly, we AFFIRM his convicition on all counts.